74 Cal.Rptr.3d 755 (2008)
161 Cal.App.4th 943
In re VINCENT M., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Jorge C, Defendant and Respondent; Vincent M., Respondent; Dan B., et al., Objectors and Appellants.
No. B198078.
Court of Appeal of California, Second District, Division Five.
April 4, 2008.
*758 William D. Caldwell, Venice, for Objectors and Appellants.
Law Office of Lawrence E. Fluharty and Lawrence E. Fluharty, under appointment by the Court of Appeal, for Defendant and Respondent.
Aida Aslanian, under appointment by the Court of Appeal, Glendale, for Respondent.
No appearance for Plaintiff and Respondent.
KRIEGLER, J.
Vincent M. was surrendered by his mother at the hospital at birth in February 2006, placed with the B. family for adoption, and declared a dependent of the court. Mother refused to identify the father. The case went directly to permanency planning. Jorge C, Vincent's biological father and a stranger to Vincent, appeared in the proceeding eight months later and filed a petition under Welfare and Institutions Code section 388,[1] asking for presumed father status and family reunification services. The dependency court granted the request, finding that Jorge was a nonstatutory presumed father entitled to reunification services without consideration of Vincent's best interest. The B.'s appeal this ruling.
Relying on In re Zacharia D. (1993) 6 Cal.4th 435, 24 Cal.Rptr.2d 751, 862 P.2d 751 (Zacharia D.,) we hold that Jorge is not a presumed father because he does not fall within the definition of presumed father under Family Code section 7611. We further hold that a biological father seeking reunification with a child, who does not come forward in the dependency proceeding until after the reunification period has ended, must establish under section 388 that there are changed circumstances or new evidence demonstrating the child's best interest would be promoted by reunification services. The rule is the same whether his paternity was concealed from him or not. In reaching these conclusions, we hold that Adoption of Kelsey S. (1992) 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (Kelsey S.) and cases decided thereafter such as In re Baby Boy V. (2006) 140 Cal.App.4th 1108, 45 Cal.Rptr.3d 198 ((Baby Boy V.) do not support the dependency court's ruling made at the section *759 366.26 permanency planning stage that a late-appearing father whose paternity was hidden from him by the mother is a presumed father entitled to reunification services without regard to the best interests of the child. Accordingly, we reverse.[2]

PROCEDURAL HISTORY
On March 8, 2006, the dependency court declared Vincent a dependent of the court based on sustained allegations under section 300, subdivision (g),[3] that Lena M. (mother) was unwilling to provide for the child and wanted the child to be placed for adoption, mother's whereabouts was unknown, and father's identity was unknown. Custody was taken from the parents and given to the Department of Children and Family Services (the Department) for suitable placement. Because the parents' whereabouts were unknown, reunification services were not ordered, permanency planning services were ordered, and a section 366.26 hearing to select the permanent plan was set for July 5, 2006, with adoption as the plan.
On July 5, 2006, Dan L. appeared in court with a prenatal paternity test report indicating he was the father. Paternity testing was ordered, and the section 366.26 hearing was continued pending receipt of the test results. On August 14, 2006, the B.'s were granted de facto parent status. In September 2006, a DNA test revealed that Dan was not the father.[4] The section 366.26 hearing was continued to October 19, 2006.
On October 19, 2006, Jorge appeared in court alleging he was the biological father, counsel was appointed to represent him, and the dependency court ordered paternity testing to determine if he was the biological father. The section 366.26 hearing was continued to November 30, 2006.
On October 20, 2006, Jorge filed a petition under section 388 requesting to "be declared presumed [father] commensurate with his conduct and DNA results and corresponding home of parent order or family reunification." The changed circumstances or new evidence he alleged was that he had lived with mother from December 2003 to December 2005 and neither observed mother was pregnant, nor was informed by mother of the pregnancy and birth. He alleged he moved to New York in December 2005 to get things ready so that she could join him there and continue their relationship, and they stayed in touch when he was in New York. *760 He alleged that the requested order was in Vincent's best interest because "upon being informed of, his possible paternity[, Jorge] immediately appeared. The child should not be deprived of his father because of the mother's fraud and concealment. Legislative scheme is family reunification." The dependency court ordered a hearing on the petition, with the section 366.26 hearing to follow.
On November 30, 2006, based on the paternity test report that Jorge could not be excluded as Vincent's biological father,[5] the dependency court found Jorge was the biological father.
Jorge's section 388 petition was heard on February 14 and 15, 2007. The dependency court took judicial notice of the file and heard testimony and argument. Jorge asked the court to find he was a presumed father under Family Code section 7611, subdivision (d) on the basis he would have taken the child into his home but for mother's concealment. In the alternative, Jorge asked the court to deem him a presumed father under Baby Boy V., supra, 140 Cal.App.4th 1108, 45 Cal. Rptr.3d 198, in that he timely came forward after learning he was the father. Jorge argued that, as a presumed father, he was entitled to family reunification services unless the court found him to fall into one of the categories for denial of reunification services under section 361.5, subdivision (b).
The dependency court granted the petition, found Jorge to be Victor's presumed father, not under the statute but under case law, and ordered the Department to prepare a report on Jorge and recommend what services to provide. The court found mother did not tell Jorge she was pregnant, Jorge moved to New York believing she would follow him, and Jorge should have known she could get pregnant. The court did not make a finding Jorge did not know she was pregnant. The court found it did not have enough information to make a finding about whether Jorge should have known mother was pregnant. Finding that Jorge "came forward at the earliest possible time, after the original paternity test was refuted," the court had "no choice" but to find he was the presumed father entitled to reunification services without consideration of the child's best interest, as "he meets the criteria set out in the case law."
After the court's ruling, the following colloquy between the prospective adoptive mother and the dependency court occurred: "[Mrs. B.]: What about the intentions of this child, what about Jack,[[6]] what about him? [¶] The Court: Ma'am, I know you are upset. I have a threshold issue that I have to determine and that's what I have done. That doesn't allow me to go to the direction that you have asked me to go. If I had the option, we might be in a totally different place. But I don't have that option at this juncture. [¶] The two ` of you sat here and you listened to the same testimony that we all listened to and I know that you were no doubt offended by everything that you heard regarding people involved. [¶] I don't have theI can't base a decision on these kinds of issues at this point. I can only look at them as they relate to the determination that I have to make today. And a lot of that didn't help me in making that decision."
The section 366.26 hearing was taken off calendar. The matter was continued to March 19, 2007. On that date, the dependency *761 court ordered reunification services, monitored visits, and an Interstate Compact on the Placement of Children for placement of Vincent with Jorge in New York.
The B.'s timely appealed from the order of February 15, 2006, granting the section 388 petition.

STATEMENT OF FACTS
Jorge lived in New York at the time of the hearing on his section 388 petition. In 1996, when he was 18 years old, he had a daughter, Alexis. Following his separation from Alexis's mother after one year together, he never had custody of Alexis. Alexis lived with her mother, who subjected Alexis to neglect and domestic violence. In 2005, when Alexis's mother did not want to care for Alexis any longer, Jorge did not seek custody, and Alexis went to Jorge's father's home to live.
Jorge met mother, who lived in Los Angeles, in 1999. In December 2003, he relocated to Los Angeles and moved in with mother. They did not use contraceptives or protection, and mother became pregnant in April 2004. Jorge was "shocked," "overwhelm[ed]," and concerned about how he could take care of a baby. They discussed terminating the pregnancy. Mother had an abortion in May 2004.
Jorge and mother continued having unprotected sexual intercourse almost every day. He knew she was not using contraception and he used no protection. Mother was also having an affair with Dan L. Mother became pregnant again, but did not tell Jorge. She said she would never tell him, because "it would kill him." Mother told Dan, who took a prenatal paternity test which indicated he was the father.[7]
Jorge testified he never knew or suspected mother was pregnant and never asked her if she was pregnant. She took a maternity leave of absence from her job in the fall of 2004, but told Jorge it was a medical leave because she had "slight arthritis in her hand." In October 2004, Jorge learned mother was having an ongoing sexual relationship with Dan; in November 2004, he audiotaped them having sex in his own bed. Jorge was irate with mother. Jorge noticed she was gaining weight, but she was a "big girl" and he thought she was eating more because she was at home. Dan observed that mother displayed an obvious weight gain of 40 or 50 pounds by January 2006. When Vincent was born in February 2006, mother told Dan that the baby died at birth.
Jorge moved to New York in late December 2005 to obtain custody of Alexis. He thought mother would follow after she had settled her affairs, but mother did not join him there. Jorge testified he did not suspect that mother had been pregnant and given birth, even though he saw a photograph in May or June 2006 revealing mother had lost significant weight. Mother did not tell Jorge about Vincent until Dan's September 2006 paternity test revealed Dan was not the father. On October 16, 2006, Jorge called the social worker and identified himself as Vincent's father.
At the time of the hearing, Jorge still had not taken Alexis into his home. He testified he was ready to have Vincent live with him, with his family's help, and he would allow mother to be part of Vincent's life. The dependency court asked: "[W]hy haven't you made the same preparations to *762 have your daughter with you.... [W]hy isn't your daughter with you?" Jorge said his father felt Jorge was not ready to have her.
In the meantime, Vincent thrived in the B.'s home, where he had been provided with the unconditional love and attention of two loving parents since he was four days old. He was in the 90th percentile of growth. Mrs. B. quit her job to be with him full time. "[The child] and his [foster/adoptive] parents have bonded. He has become an integral part of their lives, families and friends." "Jack lights up with smiles and cooing when either of the B.'s walk into the room. His loving, happy interaction is ever present when he is being held."
Even when it seemed they might lose custody of Vincent, the B's "continued to provide [him] with unconditional love and care." They had a very nurturing relationship with Vincent and their bond was "extremely close." Vincent was "a very well adjusted happy baby" in their care. The B.'s did not give up hope and continued "to be very committed with providing Vincent a permanent adoptive home." The B.'s completed the adoptive home study and were approved to adopt Vincent. The foregoing evidence as to the B.'s relationship with Vincent is uncontradicted.

DISCUSSION

The B.'s Have Standing to Appeal
Jorge and Vincent[8] contend the B.'s lack standing to appeal the order granting the section 388 petition. They contend that the B.'s are de facto parents who are not aggrieved by the order because the B.'s have no right to custody or placement of Vincent. Under the circumstances of this case, the B.'s have standing to appeal.
"Code of Civil Procedure section 902 ... permits appeals by `any party aggrieved' in a civil action. The case law has interpreted a `party aggrieved' as any person having an interest recognized by law in the subject matter of the judgment, which interest is injuriously affected by the judgment.... As the Supreme Court established in [In re B.G. (1974) 11 Cal.3d 679, 692, 114 Cal.Rptr. 444, 523 P.2d 244], a de facto parent has an interest in the companionship, care, custody and management of the child.[9] [Citation.]" (In re Joel H (1993) 19 Cal.App.4th 1185, 1195-1196, 23 Cal.Rptr.2d 878.). "`One is considered "aggrieved" whose rights or interests are injuriously affected by the judgment.' [Citation.]" (In re Lauren P. (1996) 44 Cal.App.4th 763, 768, 52 Cal. Rptr.2d 170.)
California law does not restrict a de facto parent's right to appellate review to the procedural rights provided by California Rules of Court, rule 5.534(e) (formerly rule 1412(e)) to be present at the dispositional hearing and all subsequent hearings affecting the child's status, to be represented by counsel, and to present evidence. (In re Joel H., supra, 19 Cal. App.4th at pp. 1194-1196, 23 Cal.Rptr.2d *763 878 [the de facto parent had standing to appeal the order under section 387, removing the children from her custody]; compare In re P.L. (2005) 134 Cal.App.4th 1357, 1359-1362, 37 Cal.Rptr.3d 6 [the de facto parent, in whose home the child was placed pending finding a prospective adoptive home, had no standing to complain about the order removing the child to a prospective adoptive home].)
In this case, the B.'s rights and interests were injuriously affected by the dependency court's ruling. They provided a home for Vincent since he was four days old and abandoned by mother. At disposition, the case proceeded directly to permanency planning on a track of adoption by the B.'s. As the people who, "on a day-to-day basis, assume[d] the role of parent, seeking to fulfill both [Vincent's] physical needs and his psychological need for affection and care," the B.'s were granted de facto parent status. (See In re B.G., supra, 11 Cal.3d at p. 692, fn. 18, 114 Cal. Rptr. 444, 523 P.2d 244.) They completed an adoption home study and were approved to adopt Vincent. Unlike the circumstances in In re P.L., supra, 134 Cal. App.4th at pages 1359-1360, 37 Cal. Rptr.3d 6, the B.'s always intended to adopt Vincent, and Vincent was placed there with the expectation it was an adoptive home. The dependency court permitted the B.'s to litigate in opposition to the section 388 petition, gave them access to the court file to facilitate their participation, and told them they could appeal the decision on the section 388 petition. The ruling granting the section 388 petition vacated the orders for permanency planning services and setting a section 366.26 hearing to select a permanent plan, thus taking the case off the adoption track. Services would be ordered whose goal is removing Vincent from the B.'s and giving custody to Jorge. As prior, final orders are not reviewable in an appeal of a subsequent order, the B.'s will be foreclosed from obtaining a ruling on the correctness of granting this section 388 petition if they cannot proceed in the instant appeal. (See, e.g., In re Megan B. (1991) 235 Cal. App.3d 942, 950, 1 Cal.Rptr.2d 177.)

Granting the Section 388 Petition Was an Abuse of Discretion Without Consideration of Vincent's Best Interest
The B.'s contend the order granting the section 388 petition was an abuse of discretion in that the dependency court failed to consider Vincent's best interest, and there is no substantial evidence Vincent's best interest would be promoted by granting reunification services.[10] We conclude that the order granting the section 388 petition was an abuse of discretion.
Applicable Law on Presumed Father Status and Reviving the Issue of Reunification Services

Section 361.5, subdivision (a) provides: "Except as provided in subdivision (b) ... whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians. Upon a finding and declaration of paternity by the *764 juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction, the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child."
"[O]nly a presumed, not a mere biological, father is a `parent' entitled to receive reunification services under section 361.5." (Zacharia D., supra, 6 Cal.4th at p. 451, 24 Cal.Rptr.2d 751, 862 P.2d 751.) "`[P]arental rights are generally conferred on a man not merely based on biology but on the father's connection to the mother [and/or] child through marriage (or attempted marriage) or his commitment to the child.' [Citation.]" (Id. at p. 449, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
"In order to become a presumed father, a man must fall within one of several categories enumerated in Civil Code section 7004, subdivision (a).[[11]] The only relevant category in this case is Civil Code section 7004, subdivision (a)(4), which provides that a natural father may become a presumed father if `[h]e receives the child into his home and openly holds out the child as his natural child.' (See In re Phoenix B. (1990) 218 Cal.App.3d 787, 790, fn. 3[, 267 Cal.Rptr. 269;] id. at p. 792[, 267 Cal.Rptr. 269] [presumed father status achieved when alleged father `came forward when the Department instituted dependency proceedings, offered to care for his daughter, took her into his home and ... held her out as his child'].)" (Zacharia D., supra, 6 Cal.4th at p. 449, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
"[I]f a man fails to achieve presumed father status prior to the expiration of any reunification period in a dependency case, whether that period be 6, 12, or 18 months as in this case, he is not entitled to such services under section 361.5." (Zacharia D., supra, 6 Cal.4th at p. 453, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
For a biological father who does not assert paternity until after the expiration of any reunification period, the "only remedy" is to file a petition to modify under section 388. (Zacharia D., supra, 6 Cal.4th at p. 453, 24 Cal.Rptr.2d 751, 862 P.2d 751.) "While a biological father is not entitled to custody under section 361.2[12] or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388[[13]] for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances." (Zacharia D., supra, 6 Cal.4th at p. 454, 24 Cal.Rptr.2d 751, 862 P.2d 751.) The section 388 petition will not be granted unless there are changed circumstances or new evidence demonstrating it is in the child's *765 best-interest to grant reunification services or custody. (Zacharia D., supra, 6 Cal.4th at pp. 454-456, 24 Cal.Rptr.2d 751, 862 P.2d 751; In re Jasmon O. (1994) 8 Cal.4th 398, 415, 33 Cal.Rptr.2d 85, 878 P.2d 1297.)
"`[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' [Citation.] `Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] `The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue.'" (Zacharia D., supra, 6 Cal.4th at p. 447, 24 Cal. Rptr.2d 751, 862 P.2d 751.)

Jorge Was Not a Presumed Father
The only status Jorge established was that he is the biological father. He did not show he qualified as a presumed father under the only category that might be relevantFamily Code section 7611, subdivision (d)because he did not receive Vincent into his home and hold him out as his own. Under Zacharia D., Jorge is not a presumed father. (Zacharia D., supra, 6 Cal.4th at p. 449, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
As a biological father who did not assert paternity until the case was in permanency planning, Jorge's "only remedy" was to show, under section 388, that Vincent's best interest required vacating the permanency planning orders and providing Jorge reunification services so that he might qualify as a presumed father, entitled to custody. (Zacharia D., supra, 6 Cal.4th at pp. 453-56, 24 Cal.Rptr.2d 751, 862 P.2d 751.) The dependency court erroneously ruled that Vincent's best interests were irrelevant to the determination and therefore never addressed the issue of whether providing reunification services to Jorge would be in Vincent's best interests. By failing to make the necessary determination of the best interests of the child, the dependency court abused its discretion in granting the section 388 petition. (See Zacharia D., supra, 6 Cal.4th at p. 456, 24 Cal.Rptr.2d 751, 862 P.2d 751.)

Case Law Does Not Require Treating Jorge as a Presumed Father Entitling Him to Reunification Services Without Consideration of Vincent's Best Interest
The dependency court in this case felt compelled by case law authorityapparently Kelsey S. and Baby Boy V.to deem Jorge a presumed father entitled to reunification services, without consideration of Vincent's best interest under section 388, because Jorge came forward shortly after learning he was the biological father. As we discuss below, Kelsey S. and Baby Boy V. did not compel the dependency court to reach this result. Zacharia D. held that biological fathers who appear after the end of any reunification period must file a section 388 petition to revive the issue of reunification services. (Zacharia D., supra, 6 Cal.4th at p. 453, 24 Cal.Rptr.2d 751, 862 P.2d 751.) No case has declared section 388 unconstitutional in the context of a biological father whose failure to timely appear was because the mother prevented his timely appearance. Thus, the dependency court was bound by Zacharia D. to comply with section 388 to revive the reunification issue.

1. Kelsey S.

Kelsey S. was not a dependency case. It was a private adoption case in which the unwed father was prevented from taking the child into his home and becoming a presumed father under Civil Code section 7004, subdivision (a)(4). (Kelsey S., supra, 1 Cal.4th at p. 822, 4 Cal.Rptr.2d 615, 823 *766 P.2d 1216.) Under the statutory scheme for private; adoptions, mothers and presumed fathers had greater rights to prevent termination of parental rights for purposes of adoption than unwed biological fathers.
The Supreme Court in Kelsey S. did not hold that the unwed father, who promptly came forward early in the proceeding to demonstrate a full commitment to his parental responsibilities but who was prevented from receiving the child into his home by the mother's action, was a presumed father under Family Code section 7611 under the doctrine of constructive receipt. (See Kelsey S., 1 Cal.4th at pp. 825-830, 842, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Nor did the Supreme Court hold under any theory that such a father had presumed father status.
The Supreme Court held that Civil Code "`section 7004, subdivision (a) and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.' ([Kelsey S., supra, [1 Cal.4th] at p. 849[, 4 Cal.Rptr.2d 615, 823 P.2d 1216], italics in original.) Under such circumstances, `[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities emotional, financial, and otherwise his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.' (Ibid.)" (Zacharia D., supra, 6 Cal.4th at p. 450, 24 Cal. Rptr.2d 751, 862 P.2d 751.) "In determining whether a biological father has demonstrated such a commitment, `[t]he father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit.' ... (Adoption of Kelsey S., supra, 1 Cal.4th at p. 849[, 4 Cal. Rptr.2d 615, 823 P.2d 1216], italics in original].)[[14]]" (Zacharia D., supra, 6 Cal.4th at p. 450, fn. 19, 24 Cal.Rptr.2d 751, 862 P.2d 751.) "In `emphasizing] the narrowness of our decision,' we stated that the `statutory distinction between natural fathers and presumed fathers is constitutionally invalid only to the extent it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities. Our statutes (§§ 7004 & 7017, subd. (d)(2) [petition to terminate parental rights for private adoption]) are constitutionally sufficient when applied to a father who has failed to make such a showing.' (Adoption of Kelsey S., supra, 1 Cal.4th at pp. 849-850[, 4 Cal.Rptr.2d 615, 823 P.2d 1216], italics in original.)" (Zacharia D., supra, 6 Cal.4th at p. 450, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
In Zacharia D., the Supreme Court limited Kelsey S. by noting that it involved the standard under which parental rights were terminated in the private adoption context, not the standard for determining a biological parent's right to reunification services in the dependency context. (Zacharia D., supra, 6 Cal.4th at pp. 450-451, 24 Cal.Rptr.2d 751, 862 P.2d 751.) The *767 Supreme Court stated that the issue addressed in Kelsey S. would arise in the dependency context as follows: "The issue would arise therefore, under facts not presented here, whether the statutory distinctions between biological and presumed fathers are unconstitutional as applied to a biological father who is precluded from attaining presumed father status by the mother or a third party, but who comes forward early in the dependency process, and who displays a commitment consistent with the standard set forth in Kelsey S. Extending Kelsey S. to apply in the dependency context would allow such a father to participate as a `parent' in; or end the need for, the dependency proceedings." (Zacharia D, supra, 6 Cal.4th at p. 451, 24 Cal.Rptr.2d 751, 862 P.2d 751, italics added.) Nothing in Zacharia D. suggests that a constitutional issue would arise when an unwed father does not come forward until late in the process, as when the dependency case is already in permanency planning. When a dependency case is in permanency planning, the focus has shifted to the child's needs for permanence and stability; the reunification issue may only be revived if it is in the child's best interest. (See Zacharia D., supra, 6 Cal.4th at pp. 447, 456, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
The Supreme Court in Zacharia D. did not decide this constitutional issue in the dependency context. We are not called upon to decide it in this case either. However, we note that dependent children, unlike children in a private adoption, have been seriously abused or neglected. When a dependent child is involved, the state's interest and child's interest are unique and require higher protection for the child. "The [dependency] court deals with children who have been seriously abused, abandoned, or neglected. The juvenile court has a special responsibility to the child as parens patriae and must look to the totality of a child's circumstances when making decisions regarding the child." (In re Chantal S. (1996) 13 Cal.4th 196, 201, 51 Cal.Rptr.2d 866, 913 P.2d 1075 [discussion of different purposes and policies of the Family Code and Juvenile Court Law].)

2. Baby Boy V.

In Baby Boy V., a man claiming he might be the baby's father came forward seven months after the baby was taken into custody by the Department at birth. (Baby Boy V., supra, 140 Cal.App.4th at pp. 1111-1112, 45 Cal.Rptr.3d 198.) The case was in permanency planning; the baby was in a pre-adoptive home. (Id. at p. 1112, 45 Cal.Rptr.3d 198.) The man, Jesus, stated he had had a sexual relationship with the mother but did not stay in touch with her, and she just told him about the baby. (Id. at pp. 1111-1115, 45 Cal. Rptr.3d 198.) He appeared at the next court hearing, which was a section 366.26 hearing, and requested paternity testing. (Id. at p. 1112, 45 Cal.Rptr.3d 198.) The request was denied, and at a continued section 366.26 hearing, parental rights were terminated. (Id. at pp. 1112-1113, 45 Cal.Rptr.3d 198.) At no time did Jesus file a section 388 petition requesting presumed father status and reunification services. (Id. at p. 1116 & fn. 8, 45 Cal.Rptr.3d 198.) Our colleagues in Division One reversed the orders denying paternity testing and terminating parental rights. The court held that under Kelsey S., Jesus was a presumed father and entitled to reunification services if, on remand, the dependency court finds he came forward promptly, paternity testing revealed he is the biological father, and he is not unfit. (Id. at pp. 1117-1119, 45 Cal.Rptr.3d 198.)
We agree with the decision in Baby Boy V. to the extent the court reversed the order denying paternity testing. *768 Jesus was an alleged father who was entitled to an opportunity to establish he is the biological father. (In re Paul H. (2003) 111 Cal.App.4th 753, 760-762, 5 Cal. Rptr.3d 1.) The dependency court has a duty to determine the parentage of a child when a man appears at a hearing requesting a paternity finding. (E.g., Cal. Rules of Court, rule 1413(a), (h) [renumbered as rule 5.635(h) ].) As the case before us does not involve a deprivation of the right to a determination of biological paternity, Baby Boy V. is not authority for granting Jorge's section 388 petition. "`A decision, of course, does not stand for a proposition not considered by the court.' (Nolan v. City of Anaheim (2004) 33 Cal.4th 335, 343[, 14 Cal.Rptr.3d 857, 92 P.3d 350].)" (Flatley v. Mauro (2006) 39 Cal.4th 299, 320, 46 Cal.Rptr.3d 606,139 P.3d 2.)
The conclusion in Baby Boy V. that Jesus was entitled to presumed father status and reunification services is arguably dicta and thus not entitled to binding effect on the dependency court. To the extent the Baby Boy V. court recognized presumed father status and a right to reunification services, we respectfully disagree on the basis of the holding in Zacharia D. that a biological father who appears after the end of the reunification period must proceed under section 388 in order to be awarded reunification services. In sum, like Kelsey S., Baby Boy V. does not support the decision below.[15]
"`While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any `opportunity to develop that biological connection into a full and enduring relationship.' [Citation.]" (Zacharia D., supra, 6 Cal.4th at p. 452, 24 Cal.Rptr.2d 751, 862 P.2d 751.)

Any New Section 388 Hearing Will Include Current Facts
As we reverse the findings and orders, Jorge may decide to file a new section 388 petition to modify the dispositional orders. One year has passed since the order appealed from was made. Reversal of the order "will not return the ... hearing to the same arena in which it was first held. This is because the focus of the hearing must always be upon the best interest of the child. The new hearing would entail not only the facts and evidence brought forth at the original hearing, but of necessity would require evidence as to the current status of the child." (In re Arturo A. (1992) 8 Cal.App.4th 229, 244, 10 Cal.Rptr.2d 131.) Jorge will have to plead and prove the elements for relief *769 under section 388 "based on current facts." (See ibid., italics omitted.) The child's best interest analysis must look at the "totality of the child's circumstances." (In re Chanted S., supra, 13 Cal.4th at p. 201, 51 Cal.Rptr.2d 866, 913 P.2d 1075.)
While the issue of whether Jorge knew or should reasonably have known he was a father was originally cast as relevant to whether he was a Kelsey S. father, the issue would now, on remand, be relevant to whether there are changed circumstances such that granting reunification services is in Vincent's best interest. The changed circumstance he alleged in his October 20, 2006 section 388 petition was that he did not know and was not told mother was pregnant and gave birth. On this score, we find untenable the dependency court's conclusion that the record was insufficient to determine whether or not he knew or should have known he was a father without mother telling him. It is uncontradicted in the record that Jorge and mother engaged almost daily in what he knew was unprotected sex, which resulted in pregnancy only a year earlier, lived with her during the pregnancy until six weeks before the birth, watched her get heavier with the knowledge she was on a leave of absence from work, and observed five or sue months after he moved away that she had lost weight. The dependency court stated it was not necessary to make the finding that had Jorge reasonably suspected mother was pregnant and asked her, mother would have denied she was pregnant; had he known she was pregnant, she would have shown him Dan's prenatal paternity test. While the dependency court's thinking is within the range of possibilities, the fact remains it is entirely speculative. It is undisputed there is no evidence Jorge ever asked mother if she were pregnant or had given birth. What she may have answered to a question he did not ask, and what he may have done in response to an answer she did not give, is all guesswork. Because Vincent was a child placed in the dependency system and Jorge waited eight months without "`inquiring into the existence of any children that may have resulted from his sexual encounters with'" mother, his delay placed him "at the risk of ultimately losing any `opportunity to develop that biological connection into a full and enduring relationship.' [Citation.]" (Zacharia D., supra, 6 Cal.4th at p. 452, 24 Cal.Rptr.2d 751, 862 P.2d 751.)

DISPOSITION
The findings and orders granting Jorge's section 388 petition are reversed. Upon issuance of the remittitur, the temporary stay of February 28, 2008, shall become permanent.
I concur: TURNER, P.J.
ARMSTRONG, J., dissenting.
I respectfully dissent.
The Supreme Court in In re Zacharia D. (1993) 6 Cal.4th 435, 24 Cal.Rptr.2d 751, 862 P.2d 751 noted that Adoption of Kelsey S. (1992) 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 did not apply to the facts of that case, because Zacharia's father did not claim that he was prevented from becoming a statutory presumed father on account of the actions of the mother or any third party. The Court suggested, however, that the same constitutional considerations at play in Kelsey S. "would arise ... under facts not presented here, whether the statutory distinctions between biological and presumed fathers are unconstitutional as applied to a biological father who is precluded from attaining presumed father status by the mother or a third party, but who comes forward early in the dependency process, and who displays a commitment consistent with the standard *770 set forth in Kelsey S. Extending Kelsey S. to apply in the dependency context would allow such a father to participate as a `parent' in, or end the need for, the dependency proceedings." (Zacharia D., supra, at p. 451, 24 Cal.Rptr.2d 751, 862 P.2d 751.) Unlike Zacharia D., this is just such a case.
As appellants Dan and Tina B. acknowledge, "The facts in this appeal are not disputed." The juvenile court found that, due to his girlfriend's extravagant duplicity, Jorge C. first learned of the existence of his child Vincent when Vincent was seven months old. While mother abandoned Vincent at the hospital and concocted an outrageous lie to prevent Daniel L., whom she believed to be Vincent's father, from having a relationship with his son, Jorge was in New York preparing to make a home for mother and himself. The evidence in the record leaves no doubt but that Jorge would have taken Vincent into his home and held him out as his child, thereby becoming a statutory presumed father, but for mother's actions. As soon as he learned of Vincent's existence, Jorge made arrangements to take time off from work and flew 3,000 miles to seek custody of Vincent or, barring that, reunification services. The majority's conclusion that Jorge arrived too late is contrary to a substantial line of Court of Appeal cases recognizing Kelsey S. fathers in the dependency court setting, and affording them the reunification rights which they are due under Welfare and Institutions Code[1] section 361.5. Accordingly, I would affirm the juvenile court.
Initially, I note my disagreement with the majority's conclusion that Dan and Tina have standing to appeal the trial court's grant of "Kelsey S." status to Jorge, and the reunification services which flow from that status. As both Jorge and Vincent argue, Dan and Tina are not legally aggrieved by the order, and thus have no standing to appeal.
An "aggrieved party" for purposes of Code of Civil Procedure section 902 is one whose "interest is injuriously affected by the judgment...." (In re Joel H. (1993) 19 Cal.App.4th 1185, 1195-1196, 23 Cal. Rptr.2d 878.) Dan and Tina claim to be aggrieved because "[t]he court's findings and orders thwarted [their] plan to adopt Vincent." However, they have no legal right to adopt Vincent. Thus, I fail to see how their legal interests are aggrieved.
The majority does not satisfactorily define Dan and Tina's legal interests or explain how those interests are affected by the juvenile court's finding, pursuant to Kelsey S., that Vincent's biological father is a presumed father entitled to reunification services. That is to say, they do not explain why Dan and Tina are entitled to thwart Vincent's efforts at reunification with his father by appealing an order which Vincent, through his counsel, supports. Rather, Dan and Tina simply anticipate that, if reunification services are successful, Vincent will be placed with his father. That, however, is the best-case scenario envisioned by the Legislature when it fashioned the entire dependency court process. If the process succeeds, foster parents will always relinquish custody of their charges. It is an odd conclusion indeed to deem the hoped-for result a family's reunificationa legal injury to the foster parents.
The cases relied on by the majority to support Dan and Tina's standing to appeal cannot be read to apply to the facts here. *771 The Supreme Court first stated in In re B.G. (1974) 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244 that "[d]e facto parents, such as foster parents, should be permitted to appear as parties in juvenile court proceedings to assert and protect their own interest in the companionship, care, custody, and management of the child involved." (Id. at p. 692, 114 Cal.Rptr. 444, 523 P.2d 244.) However, as the Court later explained in In re Kieshia E. (1993) 6 Cal.4th 68, 23 Cal.Rptr.2d 775, 859 P.2d 1290, that standing is limited by the rationale underlying the de facto parent doctrine itself: "The de facto parenthood doctrine simply recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored in a juvenile dependency proceeding. The standing accorded de facto parents has no basis independent of these concerns." (Id. at pp. 77-78, 23 Cal. Rptr.2d 775, 859 P.2d 1290.)
The only cases cited by the majority which concern the de facto parents' right to appeal a dependency court order are In re Joel H., supra, 19 Cal.App.4th 1185, 23 Cal.Rptr.2d 878 and In re P.L. (2005) 134 Cal.App.4th 1357, 37 Cal.Rptr.3d 6. In each of these cases, the order appealed from removed the child from the home of the de facto parents, an order in no way analogous to that at issue here, finding Jorge entitled to presumed father status and reunification services.
In In re P.L., a newborn was placed in the home of the appellant foster mother. A selection and implementation hearing was set when the minor was just over a year old. Although the foster mother had initially expressed an interest in adopting the child, she voiced some concerns regarding her health which caused her to reconsider. Accordingly, DCFS located prospective adoptive parents. The foster mother very quickly changed her mind, and sought to adopt the minor who she had cared for since birth. At a subsequent placement review hearing, DCFS recommended a change in placement, which the juvenile court ordered. The foster mother, since accorded de facto parent status, appealed. (In re P.L., supra, at pp. 1359-1361, 37 Cal.Rptr.3d 6.)
The appellate court in In re P.L. reiterated the rights of de facto parents in the dependency court arena: "De facto parents have limited rights that include: (1) the right to an attorney; (2) the right to be present at hearings; and (3) the right to present evidence and be heard. Specifically, they do not have the right to reunification services, custody, or visitation. (In re Kieshia E., at p. 82[, 23 Cal.Rptr.2d 775, 859 P.2d 1290]; Clifford S. v. Superior Court [(1995)] 38 Cal.App.4th [747,] 752[, 45 Cal.Rptr.2d 333], italics added; Cal. Rules of Court, rule 1412(e).) While de facto parents are given an opportunity to participate in the proceedings, that status does not give them the rights accorded to a parent or legal guardian. (In re Cynthia C. (1997) 58 Cal.App.4th 1479, 1490-1491[, 69 Cal.Rptr.2d 1]; In re Crystal J. (2001) 92 Cal.App.4th 186, 191[, 111 Cal.Rptr.2d 646].) Consequently, appellant has no legal standing to complain of the decision to place the child with the new prospective couple since she has no right to custody or continued placement as a mere de facto parent." (In re P.L., supra, at p. 1361, 37 Cal.Rptr.3d 6.) The Court dismissed the appeal.
In In re Joel H., supra, de facto parents, who like appellants here were both the minor's foster parents and prospective adoptive parents, appealed a juvenile court's order permanently removing the minor from their home upon a finding that *772 they had physically and emotionally abused the child. During the pendency of the appeal, the minor was returned to his mother's care. DCFS challenged the de facto parents' right to appeal, based both on mootness and lack of standing. In ruling against the DCFS, the Court of Appeal noted: "Regrettably, it is entirely possible given the family history here that Joel H. may once again become the subject of dependency proceedings. Should this occur, the finding of physical and emotional abuse and order permanently removing Joel from [the de facto parent's] custody would have res judicata effect and would prevent a court from considering her home if Joel had to be removed from his mother's custody." (Id. at p. 1193, 23 Cal. Rptr.2d 878.) Under those facts, the Court found that the de facto parents were aggrieved by the juvenile court's factual findings, unsupported by the record, which could be used in the future to prevent the minor's placement in their home. It is worth noting that the de facto parents were permitted to challenge the factual findings that they were abusive, not the removal order itself. Thus, even though the appellate court reversed the factual findings for lack of evidence, the de facto parents were not thereby entitled to return of the child. Joel H. provides no basis for a finding that Dan and Tina are aggrieved by the juvenile court's orders granting Jorge's presumed father status and ordering reunification services, because those orders do not adversely affect them as Vincent's de facto parents.
In sum, because Dan and Tina have no legal right to adopt Vincent, their legal interests are not aggrieved by the juvenile court's orders, despite the emotional pain they quite understandably feel at the possibility that they may not be able to adopt this child.
Standing to appeal aside, I believe that the dictates of our Supreme Court as set forth in Kelsey S., supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 and as consistently followed by the Courts of Appeal over the last 16 years*require affirmance of the juvenile court orders.
Kelsey S. was concerned with the distinction between "biological" or "natural" fathers, who are accorded lesser rights than are "presumed" fathers. The biological father in Kelsey S. challenged the constitutionality of the statutory scheme which permitted the adoption of his child by a third party without his consent. That is to say, California law permitted the termination of a non-offending biological father's parental rights over his objection notwithstanding that he would have been a statutory presumed father but for the unilateral actions of the child's mother. In rejecting this outcome, the Supreme Court ruled that the presumed father statute, Civil Code "section 7004, subdivision (a) and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.... If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities emotional, financial, and otherwisehis federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Kelsey S., supra, at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) While decided on equal protection grounds, the underlying premise of the ruling is the bedrock principle that a parent has a constitutional right to the care, custody, companionship, and management *773 of his or her child. (Santosky v. Kramer (1982) 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599; In re Gladys L. (2006) 141 Cal.App.4th 845, 848, 46 Cal. Rptr.3d 434.)
Here, as in Kelsey S., we are faced with the prospect of the termination of a non-offending biological father's parental rights over his objection, notwithstanding that he would have been a statutory presumed father but for the unilateral actions of the child's mother. I find no basis to distinguish Kelsey S., and therefore would conclude that Kelsey S. is applicable to dependency court proceedings, a conclusion reached by every other court which has considered the issue.
In In re Jerry P. (2002) 95 Cal.App.4th 793, 116 Cal.Rptr.2d 123 (review granted May 1, 2002, S104863, opn. ordered published June 6, 2002), our colleagues in Division Seven of this District Court of Appeal held that "Adoption of Kelsey S. applies to dependency proceedings and therefore Family Code section 7611 and the related dependency scheme violate the constitutional rights of a man seeking presumed father status to the extent they permit a mother or third person to unilaterally deny him that status by preventing him from receiving the child into his home." (Id. at p. 797, 116 Cal.Rptr.2d 123, fn. omitted.) The Supreme Court quoted the foregoing language with approval in In re Nicholas H. (2002) 28 Cal.4th 56, 67, 120 Cal. Rptr.2d 146, 46 P.3d 932. Indeed, a long line of appellate opinions have implicitly or explicitly recognized that the constitutional concerns which the Supreme Court expressed in Kelsey S. apply with equal force in the dependency court.[2] (See, e.g., In re J.L. (2008) 159 Cal.App.4th 1010, 1023, 72 Cal.Rptr.3d 27 (1st Dist., Div. 1) [Although [Fam.Code] section 7611 makes no provision for a Kelsey S. father in its list of presumptions, a father asserting valid Kelsey S. rights may effectively qualify for presumed father status as the result of his constitutional right to parent, which overrides any contrary statutory direction.]; In re Baby Boy V. (2006) 140 Cal.App.4th 1108, 1118, 45 Cal.Rptr.3d 198 (2d Dist, Div. 1) ["provided that [father] establishes on remand, that ... he ... satisfied the requirements of Adoption of Kelsey S.," he is entitled to reunification services absent a showing of unfitness]; In re Elijah V. (2005) 127 Cal.App.4th 576, 583, 25 Cal. Rptr.3d 774 (4th Dist., Div. 1) ["A biological father may be accorded parental rights and become a Kelsey S. father when his attempt to achieve presumed parent status under [Fam.Code] section 7611, subdivision (d) is thwarted by a third party and he made `a full commitment to his parental responsibilitiesemotional, financial, and otherwise.'"]; In re Andrew L. (2004) 122 Cal.App.4th 178, 18 Cal.Rptr.3d 591 (2d Dist., Div. 8); In re Paul H. (2003) 111 Cal.App.4th 753, 5 Cal.Rptr.3d 1 (3d Dist.); In re O.S. (2002) 102 Cal.App.4th 1402, 126 Cal.Rptr.2d 571 (4th Dist., Div. 1); In re Julia U. (1998) 64 Cal.App.4th 532, 74 Cal.Rptr.2d 920 (2d Dist, Div. 6).)
Notwithstanding the great weight of authority to the contrary, the majority concludes that Jorge could not establish that he is a Kelsey S. father because this is a dependency case and not an adoption case; and that in any event, pursuant to In re Zacharia D., supra, he appeared too late to establish his status as a presumed father because the reunification period had *774 ended and a section 366.26 hearing had been set. In my view, Zacharia D. has no application to this case.
In Zacharia D., supra, 6 Cal.4th 435, 24 Cal.Rptr.2d 751, 862 P.2d 751, Javan, the minor's biological father, first appeared in the dependency proceedings at the 18-month hearing (when Zacharia was 19 months old), and requested paternity testing. The juvenile court subsequently denied Javan reunification services and terminated his parental rights. Three weeks before the latter order was entered, Javan married Zacharia's mother, a step preparatory to becoming a presumed father under Family Code section 7611, subdivision (c).[3] On appeal, the Court of Appeal "assumed that Javan, as the biological father, was entitled to receive reunification services before his parental rights could be terminated." (Id. at pp. 444-445, 24 Cal. Rptr.2d 751, 862 P.2d 751.) The appellate court also concluded that, as a non-offending, noncustodial parent, "`Zacharia must be placed ... with Javan under section 361.2.'" (Id. at p. 445, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
Thus, the Supreme Court in Zacharia D. was faced with two discrete issues of statutory interpretation, neither of which is present in this case: (1) Whether the term "parent" as used in section 361.5 includes a biological (as opposed to a presumed) father, and (2) whether the mandate of section 361.2, subdivision (a) that, absent detriment to the child, a minor removed from a parent's custody must be placed with the "noncustodial parent," applies only at the time the child is first removed or may be invoked by a biological father who did not assert his paternity until the 18-month hearing.[4] The Court also considered whether a biological but not a presumed father may request reunification services "for the first time after the 18-month review hearing." (Id. at p. 445, 24 Cal.Rptr.2d 751, 862 P.2d 751.) Zacharia D. `s conclusion that a presumed father, but not a biological father, is entitled to reunification services is now enshrined in statute.[5] Jorge makes no claim *775 that he is entitled to reunification services based upon his status as a "mere" biological father. Nor did Jorge first request reunification services at the 18-month review hearing, or demand that the trial court award him immediate custody of Vincent under section 361.2, subdivision (a). Consequently, the issues addressed in Zacharia D. are simply not present in this case.
As noted above, the Zacharia D. Court pointed out (it does not appear that Javan argued the point) that Kelsey S. did not apply to the facts of that case, because Javan did not claim that he was prevented from becoming a statutory presumed father on account of the actions of the mother or any third party. After holding that "parents" entitled to reunification services under section 361.2 include presumed fathers but not biological fathers, the Court concluded: "Here, Javan failed to achieve presumed father status. The Court of Appeal therefore erred in concluding that he was a `parent' entitled to receive reunification services." (Id. at p. 452, 24 Cal. Rptr.2d 751, 862 P.2d 751.) Rather, he was left to seek reunification services based upon the standard of the best interests of the child, by way of a section 388 motion.
From this conclusion, the majority holds that the juvenile court in this case abused its discretion by failing to consider Vincent's best interests before ordering reunification services. If Jorge stood in the same position as Javan in Zacharia D., I would agree that he can only obtain reunification services by filing a section 388 petition and convincing the court that those services are in Vincent's best interests. However, Jorge occupies a completely different position than did the biological father in Zacharia D.
Javan had a brief sexual relationship with Wendy, Zacharia's mother, after which he disappeared from her life. He did not learn of Wendy's pregnancy because he chose not to maintain contact with her. Upon first learning of Zacharia's existence, when the child was 16 months old, he did not immediately come forward to care for his child but waited another three months, until the court was about to terminate Wendy's reunification services at the 18-month review hearing, to request paternity testing. By contrast, Jorge was in a committed relationship with Lena, maintaining a household together and planning their upcoming move to New York. As the juvenile court found, Jorge did not abandon this mother. Rather, Lena engaged in a web of lies to deceive Jorge about the pregnancy[6] (because she believed he was not the child's father) and Daniel L. about Vincent's live birth (for reasons known only to her). After returning to New York in December 2005, Jorge maintained contact with Lena, speaking with her by telephone and computer approximately twice a week. When in September Lena belatedly told Jorge of the existence of the baby, then seven months old, he contacted DCFS to determine how to go about obtaining custody. He was told that the next dependency court hearing was scheduled for October 19, 2006. Jorge took time off from work and flew to Los Angeles to attend the hearing. He was appointed counsel and the very next day filed papers, denominated a section 388 petition, to get custody of his son so he could care for him. In short, Jorge did everything one would hope a man in his position would do. Yet *776 the majority says he was too late, because the reunification period had ended and the case was in permanency planning.
In fact, the "reunification period" in this case ended in March 2006, when Vincent was a month old, since the DCFS sought no reunification services for the family pursuant to section 361.5, subdivision (b)(9), and recommended that the case proceed directly to permanency planning. Applying the logic of the majority opinion, it would seem that no man can ever establish presumed father status if reunification services are not ordered for the mother. Thus, the mother's unilateral action in refusing to seek reunification services results in the non-offending father's loss of rights, precisely the outcome the Supreme Court deemed constitutionally suspect in Kelsey S. This simply cannot be the law of the State of California.
Indeed, it is not. At least three Court of Appeal opinions have sanctioned the provision of reunification services to a presumed or Kelsey S. father who first appeared in the dependency court after the reunification period had ended, without a showing of the child's best interest. (In re Baby Boy V., supra, 140 Cal.App.4th 1108, 45 Cal.Rptr.3d 198 [father first appeared and requested services when child was nine months old, after the court had already set a permanent plan hearing]; In re Jerry P., supra, 95 Cal.App.4th 793, 116 Cal.Rptr.2d 123 [father first appeared and requested services at the section 366.26 selection and implementation hearing]; In re Julia U., supra, 64 Cal.App.4th 532, 74 Cal!Rptr.2d 920 [all reunification services were terminated when the child was 12 months old, before appellant's status as biological father was established and before he requested reunification services].)
In sum, in my view a section 388 petition was not necessary in order for Jorge to obtain reunification services. The juvenile court is required to attempt to determine paternity. (Cal. Rules of Court, rule 5.635.) Father sought to be found, and was determined to be, a Kelsey S. father. He was therefore entitled to reunification services, absent showing of unfitness.
"Appellant also has the fundamental right to parent his child. (In re Carmaleta B. (1978) 21 Cal.3d 482, 489, 146 Cal. Rptr. 623, 579 P.2d 514.) The right to parenting should only be disturbed in extreme cases of persons acting in an incompatible fashion with parenthood. (Ibid.) The relationship of a natural parent and a child is a vital human relationship which has far-reaching implications for the growth and development of the child. (Ibid.) The involuntary termination of that relationship by state action must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment. (Ibid.)" (In re Julia U., supra, 64 Cal.App.4th at p. 544, 74 Cal. Rptr.2d 920.)
Jorge, a non-offending Kelsey S. father, is ready, willing and able to parent Vincent. On this record, the State of California has absolutely no interest in keeping this parent and child apart. I would therefore affirm the juvenile court orders.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.
[2] On February 28, 2008, we took judicial notice of orders in the dependency court file and issued a stay of that part of the November 1, 2007 visitation transition order directing the child be taken to Jorge's home in New York in March 2008. The parties were given an opportunity to address the issue of whether the stay should become permanent. We requested the Department to file a brief on the issue. Because we reverse the order granting the section 388 petition, it follows that the order for reunification services and any visitation orders are inoperative. Upon issuance of the remittitur, the temporary stay shall become permanent.
[3] Section 300, subdivision (g) provides: "The child has been left without any provision for support; physical custody of the child has been voluntarily surrendered pursuant to section 1255.7 of the Health and Safety Code and the child has not been reclaimed within the 14-day period specified in subdivision (e) of that section; the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful."
[4] Subsequently, the dependency court ruled that Dan was not the biological, presumed, or alleged father and Dan's attorney was relieved.
[5] The lab reported the "probability of paternity: 99.99% (Prior Probability = 0.5)."
[6] Not aware Vincent had been given a name on his birth certificate, the B.'s called him "Jack."
[7] The report stated, "[i]f the mother had [a] previous pregnancy, we recommend doing an additional DNA test on the newborn child."
[8] Counsel was appointed to represent Vincent's interests. For reasons not set forth in the record, Vincent's counsel has taken the position that the court properly granted Jorge's section 388 petition.
[9] "[A] person who assumes the role of parent, raising the child in his own home, may in time acquire an interest in the `companionship, care, custody and management' of that child. The interest of the `de facto parent' is a substantial one, recognized by the decision of this court in Guardianship of Shannon (1933) 218 Cal. 490, 23 P.2d 1020 and by courts of other jurisdictions and deserving of legal protection." (In re B.G., supra, 11 Cal.3d at pp. 692-693, 114 Cal.Rptr. 444, 523 P.2d 244, fns. omitted.)
[10] We reject respondent minor's argument that, by specifying only the findings and orders of February 15, 2007, in their notice of appeal, the B.'s failed to preserve the right to challenge the order made March 19, 2007, awarding reunification services. The B.'s notice of appeal states the appeal is from the February 15, 2007 order finding Jorge was a presumed father and granting Jorge's "388 motion requesting presumed father status." This is sufficient to preserve the B.'s contention that the order granting Jorge's section 388 petition is an abuse of discretion. (See Cal. Rules of Court, rule 8.100(a)(2); Baby Boy V., supra, 140 Cal.App.4th at p. 1115, 45 Cal.Rptr.3d 198.)
[11] Civil Code section 7004, subdivision (a) has been recodified in Family Code section 7611 without substantive change.
[12] Section 361.2 provides in pertinent part: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."
[13] Section 388 provides in pertinent part that a parent "may, upon grounds of change of circumstance or new evidence, petition the court ... for a hearing to change, modify, or set aside any order of court previously made.... [¶] ... [¶] If it appears that the best interests of the child may be promoted by the proposed change of order, ... the court shall order that a hearing be held...."
[14] The father in Kelsey S. demonstrated a full commitment to the child during the pregnancy by expressing his desire to raise the child, and two days after the child was born, by filing an action to establish his parental relationship and obtain custody. (Kelsey S., supra, 1 Cal.4th at p. 822, 4 Cal.Rptr.2d 615, 823 P.2d 1216.)
[15] Nor do In re Julia U. (1998) 64 Cal. App.4th 532, 74 Cal.Rptr.2d 920 and In re Jerry P. (2002) 95 Cal.App.4th 793, 116 Cal. Rptr.2d 123 support the decision below. In In re Julia U., supra, 64 Cal.App.4th at pages 543-544, 74 Cal.Rptr.2d 920, the biological father first appeared in court and expressed a commitment to parent the child before the reunification period was terminated. "Julia had been removed from [the mother's] physical care for only two months. There was still time for the court, prior to terminating reunification services, to await [the father's] paternity test results and to give him an opportunity to visit with Julia. Then, if the testing revealed he was Julia's biological father, there was still time for the court to offer him reunification services to determine his fitness as a parent." (Ibid.) In In re Jerry P., supra, 95 Cal.App.4th at page 797, 116 Cal.Rptr.2d 123, the appellant was a nonbiological father who came forward and assumed parental responsibility promptly during the pregnancy.
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] Indeed, appellants do not contest the factual and legal findings that Jorge is entitled to presumed father status under Kelsey S. Rather, their sole argument on appeal is that "The i order, granting the 388 petition is reversible error because the court did not find that reunifying with Father is in Vincent's best interests and no substantial evidence supports such a finding at any rate."
[3] Section 7611 provides in relevant part: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with Section 7540) [conclusive presumption as to child of marriage] or Chapter 3 (commencing with Section 7570) of Part 2 [voluntary declaration of paternity] or in any of the following subdivisions: [¶] ... [¶] (c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true:

"(1) With his consent, he is named as the child's father on the child's birth certificate.
"(2) He is obligated to support the child under a written voluntary promise or by court order."
As the Law Revision Commission commented, Family Code section 7611 continued former Civil Code section 7004, subdivision (a) without substantive change, and is the same in substance as section 4(a) of the Uniform Parentage Act (1973).
[4] In addition to holding that section 361.2, subdivision (a) applies only at the time a child is first removed from the custodial parent's home, the Court held that only a presumed father is entitled to immediate custody under section 361.2. (6 Cal.4th at pp. 453-454, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
[5] Section 36-1.5 currently states: "[W]henever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians. Upon a finding and declaration of paternity by the juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction, the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child...."
[6] I reject the suggestion that an unmarried man should lose his parental rights if he trusts that his live-in girlfriend will inform him if she becomes pregnant (indeed Lena told Jorge about an earlier pregnancy) and therefore refrains from periodically inquiring if she is pregnant.