Filed 9/12/14  In re Dillon G. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re DILLON G., a Person Coming Under the Juvenile Court Law. | B252102 (Los Angeles County Super. Ct. No. CK80604) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VALERIE G.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Frank H. Free, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Valerie G. (maternal grandmother) appeals from the dependency court's October 7, 2013 order granting James T.'s (father) petition for presumed father status pursuant to Welfare and Intuitions Code section 388.[1]  She contends that the court committed reversible error by finding father to be Dillon's presumed father, and by vacating James G.'s[2] (James) presumed father status in a prior order.  We find maternal grandmother lacks standing to appeal the court's order vacating James's presumed father status, and in any event, it was untimely.  We conclude the court did not abuse its discretion in granting father's section 388 petition for presumed father status, and affirm the court's finding.

## STATEMENT OF FACTS AND PROCEDURE

On January 6, 2010, the Department of Children and Family Services (Department) placed Dillon with maternal grandmother and filed a petition alleging jurisdiction under section 300, subdivision (a) and (b).  The petition alleged Taylor G. (mother)[3] and James endanger Dillon's "physical and emotional health and safety and place[] [Dillon] at risk of physical and emotional harm and damage."  The petition stated that James is Dillon's alleged father.

At the detention hearing, the court found James the presumed father and a prima facie case had been established for detaining Dillon.  The court placed Dillon in the temporary care and custody of the Department with reunification services for both mother and James.

---

[1] All further statutory references are to Welfare and Institutions Code, unless otherwise indicated.

[2] James is not a party to this proceeding.

[3] Mother is not a party to this proceeding.

2

On February 25, 2010, the Department filed an amended section 300 petition which included a change in James's status from alleged father to biological father. At the hearing on the same day, the Department noted to the court that mother named James as Dillon's father and his name appears on the birth certificate. However, she has subsequently named father as Dillon's biological father. The Department recommended the court make an alleged father finding and order a DNA test to determine whether James is the biological father. James opposed any sort of paternity testing and represented that he was Dillon's father. Dillon was conceived and born while married to mother, and mother represented that father "doesn't want to have parental rights any ways [sic]." The court named father as the alleged father and ordered the Department to locate him. The court then dismissed the first petition and found a prima facie case had been established for detaining Dillon.

The Department conducted a due diligence search for father and several addresses were found. The Department sent notices to those addresses, one of which was a senior citizen living home located in San Dimas.

At the April 16, 2010 jurisdiction hearing, Edward R. appeared in court to claim that he was Dillon's biological father. Mother indicated that, although married to James, she did not believe he was Dillon's father, rather his biological father was likely father, although it could be Edward. The court ordered a paternity test for Edward, but made clear that it does not change James's status as the presumed father. The court then proceeded to adjudicate the section 300 petition. After closing arguments, the court sustained the amended petition, and found Dillon was described by section 300, subdivisions (a) and (b).[4] The court moved directly into the disposition hearing. The

---

[4] As amended, the petition allegations concerning James as to count a-2 and b-2 state mother and James "have a history of domestic violence and engaging in violent altercations. On prior occasions, [James] physically assaulted . . . mother. Such violent altercations on the part of [James] against . . . mother endangers [Dillon's] physical and emotional health and safety and places [Dillon] at risk of physical and emotional harm and damage." The allegations as to count b-5 state James "has a history of substance abuse and is a current user of methamphetamine which renders [him] incapable of

court found by clear and convincing evidence that return of Dillon to the care and custody of mother and James posed substantial risk of detriment. The court ordered Dillon placed in the care and custody of the Department. Both mother and James were offered reunification services. The court set a hearing to receive the results of Edward's paternity test.

On August 27, 2010, the paternity test results determined that Edward was not Dillon's biological father. Shortly thereafter on November 2, 2010, James received his paternity test results finding he was not Dillon's biological father as well.

On January 27, 2011, the Department reported that James was not Dillon's biological father. The court continued the matter to March 8, 2011, so that James could file a section 388 petition[5] to set aside the paternity findings in a timely manner. However, James did not file a petition prior to the hearing, nor did he appear for the hearing. On June 16, 2011, James filed a section 388 petition to change the court's prior order and vacate the presumed father finding. The court granted James a hearing on his request.

On September 29, 2011, the court granted James's request and found him to be only an alleged father. However, after a discussion off the record regarding paternity, the court found James not to be Dillon's alleged or biological father. Therefore, the alleged and biological father findings were also vacated. The matter was continued for the court to consider granting legal guardianship to maternal grandmother.

On October 21, 2011, James filed another section 388 petition, this time requesting to change the court's prior order and vacate the sustained allegations against

---

providing regular care for [Dillon]." James's "substance abuse endangers [Dillon's] physical and emotional health and safety and creates a detrimental home environment, placing [Dillon] at risk of physical and emotional harm and damage." The allegations as to count b-6 state James "is a registered sex offender, following a conviction of a sex crime with two minors, about twenty years ago. Such acts by [James] endangers [Dillon's] physical and emotional health and safety and creates a detrimental home environment, placing [Dillon] at risk of physical and emotional harm and damage."

[5] Judicial Council form JV-180 (Request for Change Court Order—Juvenile).

him. The court granted James a hearing on his petition, and ordered the Department to prepare a report addressing the merits.

On January 4, 2012, the Department informed the court that it had no objection to amending the language of the sustained section 300 petition to strike the words "child's father" from those allegations involving James, and insert "mother's male companion" in their stead. James's counsel requested the court vacate all allegations against him because he is not Dillon's alleged, biological, or presumed father. The court followed the Department's recommendation, but gave James an opportunity to brief the court as to whether the allegations sustained against him should be dismissed in their entirety.

James's counsel filed a motion to vacate the findings on February 3, 2012. The Department objected to vacating the allegations against James but had no objection to James being excluded from the case.

On March 1, 2012, the court heard James's motion to vacate all findings against him. James's counsel, the Department, and Dillon's counsel all argued the merits of the motion. The court then ruled against James, indicating James would still be named in the petition but as "mother's male companion" as opposed to "child's father." The court continued the hearing on the issue of legal guardianship pending proper documentation.

Maternal grandmother told the Department that she chose legal guardianship over adoption because she "would like for [mother] to have the opportunity to improve her current circumstances and stabilize her life so that she can provide a safe home for Dillon." The court granted maternal grandmother legal guardianship of Dillon on May 25, 2012, and terminated dependency jurisdiction.

Ten months later, on March 13, 2013, father filed a section 388 petition requesting to change the court's prior order and "guardianship of my son." He contended that up until the date the legal guardianship was granted, he was unaware that he was Dillon's father. After he was told he was the father, he paid for a paternity test, which revealed he

5

was Dillon's biological father.[6]  He paid child support of $350 per month in order to be able to visit with Dillon, but has "no parental rights."  The court granted a hearing on father's request.

On May 17, 2013, a Department Investigator (DI) met with father at his home where he resides with his finance and 10-year-old brother of whom father was awarded legal guardianship in May 2012.  Father is gainfully employed and was previously medically discharged from the Navy.  During the DI's visit, father's home "was found clean, well organized, appropriately furnished and with ample food."  Father told the DI "that although he desires custody of his son, . . . he respects the fact that the child has a close bond with [maternal grandmother] and in no way plans to keep the child from his maternal grandmother.  Father contends maternal grandmother is free to visit Dillon as often as she likes and as well he states that she may have Dillon over to her home for overnight and weekend visits."  Father also mentioned that maternal grandmother would not consent to a "legal" DNA test for fear that such results could be used against her and result in her loss of custody.  So with maternal grandmother's agreement, father took a "non-legal" DNA test after he left the courthouse on May 25, 2012, for which he paid $400.  Father's test results were submitted to the court.

On May 23, 2013, the court heard father's section 388 petition regarding a finding of presumed father status.  Dillon's counsel and the Department both agreed that father's petition should be granted, however, maternal grandmother objected to the petition.  The Department noted that father is the biological father, continues to pay child support, and has developed a relationship with Dillon.  The court continued the matter for an evidentiary hearing and briefing on the issue of presumed father status.  Father was granted unmonitored weekend visits.

On June 24, 2013, the matter was continued.  The court held the evidentiary hearing on the issue of presumed father status on October 7, 2013.  Maternal

---

[6] The DNA test results were positive with a 99.99% probability that Dillon was his biological child.

grandmother's counsel objected to admitting father's DNA results because the DNA test states "'in no way are the results to be used in a legal procedure.'" The court overruled counsel's objection and admitted father's DNA results, finding that "it's in the best interest of the child to be able to resolve the parentage issue." Maternal grandmother's counsel also objected to father's section 388 petition because it requested legal guardianship, rather than presumed father status. Father's counsel responded that father filled out the section 388 petition, he is not an attorney nor does he have the correct language. Father's counsel further stated that the court did receive a JV 505[7] which addresses father's desire to be the presumed father. The court again overruled maternal grandmother's counsel's objection, and noted that the court has discretion to deal with paternity issues in the best interest of the child.

Maternal grandmother called father as an adverse witness. He testified that he had an intimate relationship with mother, but did not know she was married at the time. He did not know of Dillon's birth, nor did mother tell him he was Dillon's father. Father stated that when he was on leave from the military and visited his mother, mother showed up with Dillon and James. Mother told father that James was Dillon's father.

Father was questioned about his residence in April 2010. He testified that he temporarily stayed at a residence in San Dimas, but only for short periods of time because the residence was a senior citizen living home. He was merely a visitor at the facility. Father testified he never received notice of the dependency proceedings or any contact from the Department.

Father testified that he encountered mother and maternal grandmother at the dependency court on May 25, 2012. It was on that date that father was informed Dillon could be his son. The maternal grandmother did not tell father that she was in court seeking legal guardianship of Dillon. Father left the court and got a DNA test that day, which revealed he was Dillon's biological father.

---

[7] Judicial Council form JV-505 (Statement Regarding Parentage—Juvenile).

Father contacted maternal grandmother after the DNA test confirmed Dillon was his son. Father testified he provided support for Dillon, took care of his clothing items, and had given maternal grandmother money every month. At first, father would pick Dillon up from school and take him to dinner on Tuesday and Thursday. After approximately one month, father had overnight weekend visits with Dillon once a month.

The maternal grandmother then called mother as her next witness. Mother testified that she told father that Dillon was his son when Dillon was three-months-old. Mother said father told her that he never wanted children and did not ask for a relationship with Dillon at that time. Mother told James that father was Dillon's biological father, however, James signed Dillon's birth certificate at the hospital because it was mother's intent to have James as Dillon's father. Mother admitted she did not initially reveal to the court that father could be Dillon's father. It was only at a later hearing that mother told the court that there could possibly be another biological father.

The court entertained argument regarding the presumed father status. Father's counsel argued that father met all of the necessary criteria to be declared a presumed father. Maternal grandmother's counsel argued that because father did the come forward at the earliest possible convenience, he did not qualify as a presumed father. Maternal grandmother's counsel stated that the Department located father as ordered by the court and sent proper notice to his residence at the senior citizen living home in San Dimas back in April 2010. Counsel also contended that it was judicial error to vacate the finding that James was the presumed father. Dillon's counsel responded that James asked the court to vacate his presumed father status and no party appealed. Dillon's counsel argued it was in Dillon's best interest to have a father who was interested in his well-being. Both Dillon's counsel and the Department reiterated that the court should grant the section 388 petition finding father the presumed father. Mother's counsel joined with maternal grandmother's argument to deny father presumed father status.

The court stated that after considering the arguments by counsel and the evidence presented, it found father's testimony to be credible. After father found out that Dillon may be his son on May 25, 2012, he promptly took a DNA test and "thereafter proceeded

8

to take steps to show his commitment to his parental responsibilities." Those responsibilities included "visiting Dillon and providing financial support according to the JV 505. It outlines the parental responsibilities that [father] has adopted, including paying $350 a month, gotten all of his hair cuts, bought him shoes, fully paid for both of his last birthday parties, and he has consistent overnight weekend visitations and sometimes during the week and participated in day care." The court noted that with respect to maternal grandmother's argument of judicial error in vacating James's presumed father finding, it was James who asked the court for the finding to be vacated, and no party appealed. The court found it was "in the best interest of Dillon to have a father and [father] is not only willing and able to do it but he has a record of showing his commitment to raising and supporting Dillon since he got the DNA results."

The court turned to father's request for placement of Dillon. Maternal grandmother's counsel argued that it would not be in Dillon's best interest to "rip" him from maternal grandmother. The court granted father's section 388 petition and found that father met his burden to show a change in circumstance, and it was in Dillon's best interest to have a relationship with father. The court then terminated the legal guardianship and released Dillon to father.

Maternal grandmother filed her notice of appeal on October 7, 2013.

## DISCUSSION

Maternal grandmother appeals from the court's October 7, 2013 order granting father's section 388 petition for presumed father status. She contends the court committed reversible error by finding father to be Dillon's presumed father, and by vacating James's presumed father status in a prior order.

9

**Standing**

The Department contends maternal grandmother lacks standing to challenge the court's paternity findings as to both father and James. (Code Civ. Proc., § 902; *In re Carissa G.* (1999) 76 Cal.App.4th 731, 734 (*Carissa G.*).) We disagree in part and explain below.

In dependency proceedings, only a party aggrieved by an order has standing to appeal. (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 837; see Code Civ. Proc., § 902 ["Any party aggrieved may appeal . . . ."].) The appellant must establish he or she is an aggrieved party to obtain a review of a particular ruling on its merits. (*Carissa G., supra,* 76 Cal.App.4th at p. 734.) "To be aggrieved, a party must have a legally cognizable immediate and substantial interest which is injuriously affected by the court's decision. A nominal interest or remote consequence of the ruling does not satisfy this requirement. [Citations.]" (*Ibid.*) The fact that a legal guardian takes a position on a matter at issue in a juvenile dependency case which affects the child does not alone constitute a sufficient reason to establish standing to challenge an adverse ruling on it. (*In re Frank L.* (2000) 81 Cal.App.4th 700, 703; *Carissa G., supra,* at p. 736.)

The Department relies on *In re Vincent M.* (2008) 161 Cal.App.4th 943 (*Vincent M.*) and contends that maternal grandmother lacks standing because she never intended to adopt Dillon, rather remain his legal guardian in order to give mother the opportunity to improve her circumstances and stabilize her life for Dillon. However, the Department's reliance on *Vincent M.* is misplaced because *Vincent M.* dealt the standing of de facto parents, while here, we are dealing with a legal guardian. It is well-established that legal guardians have significant substantive rights and recognized interests in the companionship, care, custody and management of their children. (See *In re H.G.* (2006) 146 Cal.App.4th 1, 9; see also *In re P.L.* (2005) 134 Cal.App.4th 1357, 1361 (*P.L.*).) In contrast, de facto parents only have certain circumscribed procedural rights in dependency proceedings. (See *P.L., supra,* at p. 1361.) Furthermore, termination of maternal grandmother's legal guardianship and custody of Dillon was a direct result of

the court's order finding father to be Dillon's presumed father. Therefore, maternal grandmother's rights and interests were injuriously affected by the court's order in an immediate and substantial way. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 948.) This is especially true given that maternal grandmother seeks to regain custody of Dillon and have her legal guardianship reinstated. Accordingly, maternal grandmother has standing to seek appellate review as to the court's order finding father to be Dillon's presumed father.

Conversely, the court vacating James's presumed father status in a prior order does not adversely affect her rights or interests in an immediate or substantial way. To the contrary, the court vacating its finding led to maternal grandmother obtaining legal guardianship and custody of Dillon. And it was only the court's finding that father was Dillon's presumed father that led to termination of her legal guardianship and custody of Dillon. Therefore, maternal grandmother lacks standing to assert the court erred in vacating James's status as the presumed father.[8] As a result, we will only review the merits of the court's order granting father's section 388 petition for presumed father status.

---

[8] We also find that maternal grandmother's appeal from the court's order vacating James's presumed father status is untimely. An appeal from the most recent order entered in a dependency matter may not challenge prior orders, for which the statutory time for filing an appeal has passed. (*In re Jonathon S.* (2005) 129 Cal.App.4th 334, 340.) James's presumed father finding was vacated by the court on September 29, 2011, and maternal grandmother filed this appeal more than two years later. Thus, the only issue before us is the order finding father to be Dillon's presumed father.

**Welfare and Institutions Code Section 388 Petition:  Presumed Father Status**

Maternal grandmother contends the court committed reversible error by granting father's section 388 petition.  We disagree.

Father filed a section 388 petition for the purpose of achieving presumed father status and obtaining custody of Dillon.  Under the dependency statutes, presumed fathers have far greater rights than biological fathers.  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449 (*Zacharia D.*).)  Only a presumed father is entitled to reunification services under section 361.5 and custody of his child.  (*Id.* at p. 451.)  A biological father who has neither legally married nor attempted to legally marry the mother of his child can become a presumed father if he receives the child into his home and openly holds out the child as his natural child.  (*Vincent M., supra,* 161 Cal.App.4th at p. 954, citing Fam. Code, § 7611, subd. (d).)

Maternal grandmother relies on *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) to support her contention that father failed to promptly come forward and demonstrate a full commitment to his parental responsibilities.  The Supreme Court in *Kelsey S.* held that Civil Code "section 7004, subdivision (a)[9] and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.  If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Kelsey S., supra,* at p. 849,

---

[9] Civil Code former section 7004, subdivision (a), is the predecessor to Family Code section 7611, and related statutes.

italics omitted.) Therefore, a biological father may attain presumed father status even if the mother thwarts his efforts if he "promptly attempt[s] to assume his parental responsibilities as fully as . . . his circumstances permit." (*Ibid.*; see also *Zacharia D., supra,* 6 Cal.4th at p. 450, fn. 19.)

This case presents a different circumstance than *Kelsey S.* given the belated stage of the dependency process in which the presumed father issue was raised. (See *Zacharia D., supra,* 6 Cal.4th at p. 453.) "'[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' [Citation.] 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.]" (*Id.* at p. 447.) Thereafter a parent must file a section 388 petition to revive the issue of reunification. (*Vincent M., supra,* 161 Cal.App.4th at p. 956; *Zacharia D., supra,* 6 Cal.4th at p. 447 ["'Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information'"].) The section 388 petition will not be granted unless the parent proves that there are changed circumstances or new evidence demonstrating it is in the child's best interest to grant reunification services or custody. (*Vincent M., supra,* at p. 955.) Therefore, to succeed on a section 388 petition, a petitioner must establish "by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

Here, the court found father's testimony at the section 388 hearing to be credible and that father rose to the level of presumed father status. Father provided ample evidence to establish presumed father status. He promptly took a DNA after discovering Dillon could be his biological son. "[T]hereafter [father] proceeded to take steps to show his commitment to his parental responsibilities." Those responsibilities included "visiting Dillon and providing financial support according to the JV 505. It outlines the

13

parental responsibilities that [father] has adopted, including paying $350 a month, gotten all of his hair cuts, bought him shoes, fully paid for both of his last birthday parties, and he has consistent overnight weekend visitations and sometimes during the week and participated in day care."

Maternal grandmother's contends that father failed to promptly come forward to assume his parental responsibilities given mother's "openness with [the Department] and with the juvenile court concerning [father's] apparent biological paternity of Dillon. . . ." We disagree. There is substantial evidence that mother was not forthright with the court or the Department about father. She only disclosed the possibility that father might be Dillon's biological father at a later hearing, and further stated it was likely that Edward could be the biological father as well. Furthermore, mother unilaterally withheld Dillon from father by failing to disclose that Dillon could be his son, and then purposely misleading him to believe that James was Dillon's biological father. Although the Department sent a notice of the pending dependency proceedings to father's listed address, father testified at the section 388 hearing that he never received notice of the dependency proceedings or any contact with the Department. There is substantial evidence that father promptly came forward to assume his parental responsibilities as soon as he knew Dillon could be his biological son.

As the court found, it was "in the best interest of Dillon to have a father and [father] is not only willing and able to do it but he has a record of showing has commitment to raising and supporting Dillon since he got the DNA results." The Department told the court that father is the biological father, continues to pay child support, and has developed a relationship with Dillon. Dillon's counsel agreed it was in Dillon's best interest to have a father who was interested in his well-being. Both Dillon's counsel and the Department urged the court to grant father's section 388 petition for presumed father status. Maternal grandmother's counsel argued that it would not be in Dillon's best interest to "rip" him form maternal grandmother. However, father made clear that although he desires custody of his son, he respects the fact that the child has a close bond with maternal grandmother and in no way plans to keep the child from his

14

maternal grandmother. "The relationship of a natural parent and a child is a vital human relationship which has far-reaching implications for the growth and development of the child. [Citation.]" (*In re Julia U.* (1998) 64 Cal.App.4th 532, 544.) Thus, it was in Dillon's best interest to reunify him with a fit natural parent who made an appearance at the earliest possible convenience, and continues to demonstrate his commitment to his parental responsibilities.

Maternal grandmother's lastly contends that father's DNA results purporting to show that he was Dillon's biological father were inadmissible because "in no way are the results to be used in a legal procedure" as set forth in the Uniform Act on Blood Test to Determine Paternity (Fam. Code, § 7500 et seq.). The court admitted father's DNA results on the grounds it was "in the best interest of the child to be able to resolve the parentage issue." "The trial court is 'vested with broad discretion in ruling on the admissibility of evidence.' [Citation.] '[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.' [Citation.] '"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason . . . ."'" (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432.) Maternal grandmother is not contending that father is not Dillon's biological father, rather that he did not abide by the proper legal procedure. However, father told the Department that maternal grandmother would not consent to a "legal" DNA test for fear that such results could be used against her and result in her loss of custody. Based on the court's wide discretion to admit such evidence, particularly when in the best interest of the child, father's DNA test was properly admitted into evidence. The trial court's ruling is reasonable considering father's testimony that maternal grandmother conditioned father's visitation of Dillon on father taking a "non-legal" DNA test.

Viewing the evidence in the light most favorable to the judgment, there is substantial evidence that father's efforts to establish paternity demonstrated a genuine and admirable commitment to the son. Father, a non-offending, stable, employed, and financially responsible adult, took steps to establish paternity immediately after learning Dillon was his son. Father did not come forward at an earlier date because he was

15

unaware Dillon was his son.  Mother publically held Dillon out as James's child.  Mother did not initially disclose father's identity to the court or the Department, and father was thereby prevented from receiving Dillon into his home and holding himself out as the Dillon's father.  (Fam. Code, § 7611, subd. (d).)  For these reasons, father was entitled to presumed father status.  (*Kelsey S., supra,* 1 Cal.4th at p. 849.)  Therefore, the court did not abuse its discretion in granting father's section 388 petition for presumed father status.

## DISPOSITION

The orders of the dependency court are affirmed.


KRIEGLER, J.


We concur:



TURNER, P. J.



MOSK, J.