Filed 6/30/21  In re R.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076430 |
| Plaintiff and Respondent, | (Super.Ct.No. J280763) |
| v. | OPINION |
| C.R. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant, C.R.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant, J.M.

1

Michelle D. Blakemore, County Counsel and Svetlana Kauper, Deputy County Counsel for Plaintiff and Respondent.

The San Bernardino County Children and Family Services (department) detained two-year-old R.M. from his mother and father due to domestic violence, drug use, and mental health problems, and father's status as a registered sex offender. Both parents participated in reunification services, but ultimately failed to make progress, and Superior Court judge Erin K. Alexander terminated services and set a selection and implementation hearing. (Welf. & Inst. Code, § 366.26, unlabeled statutory citations refer to this code.)

Before the hearing, mother filed a petition to modify the order terminating services (§ 388) which relied on the fact that she had recently enrolled in several online classes as a basis for requesting that the judge give her another chance at reunifying. However, mother didn't present evidence she had completed any of the classes, and, as a result, the judge denied the petition without holding a hearing and proceeded to the selection and implementation hearing.

Following testimony from mother and father about the nature of their relationship with R.M., the court determined the child was appropriate for adoption and likely to be adopted, the beneficial relationship exception did not apply, and terminated their parental rights. Mother and father have appealed separately. Mother argues the judge abused her discretion when she denied her petition for modification without an evidentiary hearing.

Father argues the judge erred when she determined the beneficial relationship exception to adoption doesn't apply to his relationship with R.M.

We affirm both orders.

# I

# FACTS

A. *Detention and Removal*

Two-year-old R.M. came to the attention of the department on March 6, 2019, when father attempted suicide by taking prescription medications. Mother was at work at the time, but the child and his older half-siblings were there. Father was placed on a Welfare and Institutions Code section 5150 hold as a result of the incident.

Father was arrested at the same time for a domestic violence incident involving mother, which had occurred a few days earlier. Mother told the social worker father had become violent with her on several recent occasions and most recently had broken their bathroom sink during an incident. On another occasion, he had cracked the same sink by grabbing her and pushing her into it. She also accused him of raping her when she attempted to go to bed after another night-time argument. Mother said she was particularly disturbed by the rape because father, whom she characterized as her best friend, knew she had been raped as a 12-year-old girl.

Mother told the social worker she no longer wanted to be with father and planned on getting a restraining order. However, she later said she had decided not to get a restraining order because a domestic violence counselor told her a criminal protective

3

order would issue. The social worker told mother the claim was not accurate. The counselor later told the social worker they had in fact told mother she needed a restraining order and tried to help her set up an appointment to get one. Mother refused to set up an appointment.

R.M.'s half siblings, who were 7 and 13 years old at the time, told the social worker mother and father frequently yelled at each other. The younger sibling denied they hit each other. However, the older sibling reported both parents hit each other and described an incident when father pushed mother into the shower door, breaking it. He also said he overheard them talking about father having raped mother.

The social worker discovered father was a registered sex offender (Pen. Code, § 290) due to his conviction in another state for molesting a family member when he was 23 years old. Father told the social worker he had been convicted 10 years earlier of molesting his niece, who was then 16 years old. He said he served four and a half years in prison for the crime. Father denied the charges of domestic violence and rape in this case and said R.M.'s younger half sibling had issues from being exposed to domestic violence between mother and his biological father.

The biological father of one of the siblings told the social worker mother was addicted to opioids and she was using methamphetamines. R.M.'s father also said he was concerned mother was taking too much pain medication, more than the amount prescribed.

4

On April 19, 2019, the department temporarily detained the child and placed him in a foster home. Four days later, the department filed a section 300 petition under subdivisions (b) and (d) alleging his parents had failed to protect him and placed him in danger of sexual abuse. At the detention hearing, the judge detained the child and granted mother and father separate supervised visits once a week for two hours each.

In their jurisdiction and disposition report, the department recommended that mother receive family reunification services, but that father be bypassed under section 361.5, subdivision (b)(16) because he is a registered sex offender. The department identified several concerns related to the child's safety, including the threat of significant domestic violence, the recent rape, and father's past conviction based on his having sexual intercourse with a teenage relative. Both parents had prior child welfare referrals dealing with domestic violence. They had claimed they were starting couples counseling in the prior case but did not follow through. Though mother initially said she wasn't going to reunify with father, she appeared to have changed her mind.

The department reported the parents both underestimated the danger to the child. Father denied or downplayed the existence of domestic violence in the home. Mother said she didn't believe the child was himself at risk of a physical injury simply because he was present when she was abused, though she did admit the risk of emotional harm. The department also reported mother had not followed through with domestic violence counseling to help her obtain a restraining order and refused to schedule an appointment. Father said mother had gone to the district attorney to retract her prior statements about

5

domestic violence. Mother said she believed father's violent actions were "not him" but rather the result of the psychotropic medication he was taking. Mother also posted bail to get father out of jail and allowed him back in the home.

The department also reported mother's prior substance abuse was a problem. She admitted she used methamphetamines from age 16 to 18 and relapsed at age 24, but said she used them only a couple of times. She also admitted having abused prescription medications in the past but said she had stopped using them. Mother submitted to two random drug tests in April and May 2019. The April test came back positive for marijuana. Mother failed to appear for two drug tests in June 2019. As a result of this history, mother's reunification case plan was composed of a domestic violence program, anger management, general counseling, parenting classes, substance abuse treatment, random drug testing, and a 12-step program.

Father also had a history of substance abuse, beginning with his use of marijuana at 13 and alcohol at 15. Father said he used "cocaine, acid, mushrooms and marijuana" between 16 and 19. He abstained from drug use while incarcerated but said he resumed using marijuana and alcohol occasionally after his release. Father's drug tests returned positive for marijuana four times in April and May 2019.

On June 25, 2019, father submitted a waiver of rights (JV-190) form, submitting to the allegations on the basis of the social worker's report. Mother acknowledged "some of the allegations" but argued against the (d) allegations related to sexual abuse, saying the

6

children were not sexually abused. The court found all the allegations true and sustained the petition under subdivisions (b) and (d).

However, the department changed its position and recommended reunification services for father. They judged the question a close call and noted the removal occurred "primarily as a result of substance abuse, domestic violence, and mental health concerns rather than a sexual abuse to the child." They submitted a letter from a forensic and clinical psychologist saying father would benefit from reunification services and they "are likely to prevent the abuse or neglect of the children in the future." The department proposed father undertake a psychotropic medication evaluation, a treatment program for sexual offenders, a domestic violence program, an anger management program, a psychiatric or a psychological evaluation, general counseling, substance abuse treatment, random drug testing, and attend a 12-step program.

The judge found father to be the child's presumed father. She noted the child was bonded to father and ordered reunification services. The judge granted supervised visits a minimum of once a week for two hours.

B. *Failure of Reunification*

By December 16, 2019, the department recommended terminating services for both parents and setting a selection and implementation hearing.

Mother and father had continued their relationship and were experiencing more trouble. Mother said father had kicked her out of the home, taken away her car, and threatened her. She said she had nowhere to go. She also said father had sabotaged her

7

efforts to reunify with their son. The department referred her to a domestic violence shelter but she chose not to go. Father claimed mother had broken into his home twice, stolen his car, and showed up at his home while under the influence of drugs.

Mother made minimal progress in her case plan. She had been referred to Greater Hope Foundation for her parenting, anger management, and substance abuse treatment and to High Desert Child, Adolescent and Family Services for other components of her plan. Mother didn't participate in these services. She also had a poor record on drug tests. She tested negative on three occasions. However, she didn't show up for seven other tests. Before the hearing, mother missed another six drug tests. Mother also missed almost half her visits with R.M. and often arrived late. When she did attend, the visits were appropriate. Father regularly visited and R.M. enjoyed his visits.

At a contested hearing on March 4, 2020, the department changed its position and recommended father receive an additional six months of services. The judge ordered that father continue to participate in reunification services. However, he terminated mother's reunification services.

By June 24, 2020, the department again recommended terminating father's reunification services and set a section 366.26 hearing for the child. Father attended and participated in the components of his case plan. However, he maintained a relationship with mother and attended a video visit with her. Moreover, despite participating in a substance abuse program, father was arrested for driving under the influence of alcohol in May 2020. Father admitted he had relapsed, and his drug and alcohol counselor extended

his substance abuse program from six to nine months. Father was also placed on a schedule of daily check-ins with his substance abuse counselor.

R.M. and his siblings remained in the same placement. He appeared happy and well-cared for. He also appeared to have bonded with his caregiver and looked to her for comfort, assurance, and protection. He met his developmental milestones and did not show any reason for concern about his mental or emotional health.

Father visited the child consistently and the visits went well. In contrast, mother's visits with R.M. were inconsistent. Mother asked for visits every other week rather than every week. R.M. appeared to enjoy his visits with mother.

On August 12, 2020, the court terminated father's reunification services and set a selection and implementation hearing for R.M. The department's section 366.26 report recommended terminating the parental rights of both parents and freeing R.M. for adoption. They reported father continued to visit fairly consistently, missing only two visits in the previous reporting period. The visits went well. However, in October 2020, the child started to say things like "I don't want to come here" and "I want to go home with my Mom," referring to his caregiver. Mother remained inconsistent in her contact with the child, missing six visits from April until November 2020.

In the social worker's opinion, R.M. was appropriate for adoption. He was a bright, active child, who loved playing outdoors. He met his developmental milestones and exhibited excellent verbal and communication skills. Since being placed, he had adjusted well and viewed his caregivers as parental figures referring to them as "mom"

9

and "dad." He and his caregivers shared a loving bond and displayed a healthy relationship. In turn, the caregivers showed commitment to the child's long-term care and expressed a strong desire to adopt him.

### C. *Change in Circumstances Petition*

On December 21, 2020, mother filed a section 388 petition.[1] Mother asked the court to modify the order terminating her services because her circumstances had changed. She represented she had moved into a new home, started a new job, and participated in "extra classes."

To support her claim to have enrolled in the classes, mother attached screenshots showing her enrollment in an "online Alcohol & Other Drugs Awareness course" in July. The enrollment form specified it was "not a certificate of completion." Mother also attached letters of enrollment in online courses on parenting basics, coparenting and divorce, domestic violence, battery intervention, and anger management. Each letter indicated she had enrolled the same day, July 12, 2020, and each noted it "is not a certificate of completion." Mother said the certificates of completion were "coming in the mail." Mother also claimed she had been clean and sober for five months, but she didn't attach drug test results. Mother said she believed a change in the prior court order was in the child's best interest because she believed he needed both parents to help him flourish.

---

[1] Father filed a section 388 petition as well, which the judge denied; however, father does not appeal from that order.

The department recommended the judge deny mother's petition. On January 8, 2021, the social worker met with mother to assess her circumstances. She was working part-time and collecting unemployment. She had also bought a trailer to extract herself from homelessness and she was planning to move to a less expensive lot. She remained in a relationship with father whom she described as "a big support, nothing negative with him." Mother told the social worker she had been sober since July 12, 2020, when she enrolled in her online classes. Ultimately, mother wasn't able to establish she had completed the classes. At first, she claimed she completed all of them but later said she had completed two classes. However, she didn't provide certificates of completion for any classes.

Mother said it had become more difficult to maintain visits during the pandemic, but said the visits were "going great." She said she thought R.M. "want[ed] to visit her" and described them as fun. However, the foster family agency reported mother had missed 11 visits between January 2020 and January 2021. They reported mother frequently cancelled or showed up later than the 15-minute grace period. The caregiver said mother was attentive and affectionate to the child when she did attend the visits.

At the January 19, 2021 hearing, the judge denied mother's section 388 petition. The judge noted she had attended a class session or two but had provided no evidence she had completed any programs. The judge also noted mother had shown no evidence of sobriety and she had admitted continuing to use until July 2020. The judge expressed concern that the issue of substance abuse had not been resolved. Mother also missed a

significant portion of her visits over the prior year. The court concluded mother had not demonstrated a change in circumstances and denied the petition.

D. *Section 366.26 Hearing*

At the contested section 366.26 hearing held the same day, mother testified that prior to the removal the child had lived with both parents, and both shared responsibilities as his primary caregivers. She said the child still hugged her, called her "mommy," and told her he missed her and loved her when they saw each other. She said the child greeted her by running up to her and giving her a hug at the beginning of every visit. He was excited to show mother the snacks he had or the toys he had brought with him. She said she loved R.M.

Father testified that he participated in the child's daily care before the removal. Afterwards, he consistently visited the child. He said R.M. usually greeted him with a big, tight hug and a kiss. During the visits, father played with the child, worked on his numbers and colors. Father also soothed and comforted him when he hurt himself or became grumpy or tired. When saying goodbye, R.M. cried and told father he missed him and wanted to come home with him. Father wanted to resume full-time care of the child, or at least have a relationship with him.

Following arguments of all counsel, the judge found R.M. generally and specifically adoptable. She found mother had not maintained consistent visits with R.M. and there was no detriment to the child in severing the relationship.

The judge found that father was consistent in maintaining regular contact with R.M. However, she found father and son didn't have a beneficial relationship on the ground that father didn't occupy a parental role. "[T]he next issue is whether he currently stands in a parental role and, again, his visits are described to go well and I accept his representation as to how those visits go but the child has been out of his care for half of his life at this point, some two-plus years and now [the child] looks to the caregivers to meet his day-to-day needs. The father currently has limited supervised visits. [¶] . . . [W]here we are at the .26 [hearing is] that the child now looks to the current caregiver to meet his daily needs and . . . the father no longer stands in the parental role to the child."

The judge also determined any detriment to the child from severing the relationship were outweighed by the benefits of adoption. She determined "there's been no evidence that it would be detrimental to the child." "These are good visits but there's no indication that the child reacts negatively after the visits or has any emotional or behavioral concerns in the time period that he's not with the father." She noted the benefit of adoption was "the 14-plus years of permanency that adoption would provide" and found "that far outweighs an incidental detriment" from the termination of father's parental rights. The judge terminated both parents' parental rights and freed R.M. for adoption.

Mother and father filed separate timely notices of appeal. Mother challenges the order terminating her parental rights on the ground that the judge should have granted her

a hearing on her section 388 petition. Father challenges the order terminating his parental rights on the ground that the beneficial relationship exception applies.

## II

## ANALYSIS

A. *Change in Circumstances*

Mother argues the judge erred in denying her an opportunity to be heard on her section 388 petition. She argues the setting of a hearing was warranted because she demonstrated prima facie evidence that her circumstances had changed and that reinstating reunification services would be in the best interest of the child.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.] [If] [h]owever, . . . the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

"In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.* (2004)

14

123 Cal.App.4th 181, 189.) "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) The change must be so significant that it requires a setting aside or modification of the challenged prior order. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "A ruling on a section 388 petition is committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1088-1089.) We will reverse only if the judge exceeded the bounds of reason, and we have no authority to substitute our own judgment if the facts allow two or more inferences. (*Ibid.*)

In this case, the child was removed due to mother's substance abuse and incidents of domestic violence involving both parents. As a result, mother's reunification case plan was composed of a domestic violence program, anger management, general counseling, parenting, substance abuse treatment, random drug testing, and a 12-step program. Mother failed to reunify with her child because she made minimal progress on both of these problems.

She never appeared to grasp the domestic violence cycle or the negative impact it can have on children. She said she didn't believe R.M. was at risk of a physical injury by virtue of being present when domestic violence occurred. She didn't attend domestic violence counseling sessions despite being referred to a counselor several times. In

15

addition, she consistently sought to minimize and explain away father's abuse. Father said she went to the district attorney to retract her prior statements against him. She said his violence was the result of his taking psychotropic medication. She also bailed out father from jail and allowed him back into the family home. Moreover, the episodes of domestic violence continued during the reunification period. On one occasion mother said father had kicked her out of the home, took away her car, and threatened her. Father said mother had broken into his home twice, stole his car, and showed up at his home while under the influence of drugs. All of these incidents suggest mother was not dealing with the underlying problem.

Mother also failed to deal appropriately with her drug dependency. It was evident she continued to use drugs during the reunification period because she failed to show for at least 13 drug tests which were mandated by the court, making the tests presumptively positive. Nor did mother take advantage of opportunities to obtain drug treatment during reunification. At bottom, mother failed to participate in any reunification services aimed at addressing the problems which caused the dependency.

Mother's attempt to show changed circumstances was inadequate. With respect to the elements of her case plan, all mother did was submit screenshots showing she had enrolled in several online classes. Each enrollment form said on its face, "This letter indicates enrollment in one of our courses. It is not a certificate of completion." Though completing these classes might have helped mother come to terms with the problems she faced, in the end, she didn't present any support for her claim she had completed them. In

16

her interview with the social worker, she claimed she had finished all the courses, but later amended her statement to say she finished only two. She couldn't provide certificates of completion for any classes.

Even if she did attend the classes, she didn't show the classes had worked a change in circumstances. She remained in a relationship with father who she described as "a big support, nothing negative with him." And she didn't participate in a single drug test to demonstrate her sobriety.

Mother argues the evidence of her participation in programs and her progress in them was uncontradicted because "[i]t did not appear the social worker attempted to contact the facility where mother was participating in programs." However, the department didn't have the burden of proving whether mother had enrolled in services or made progress in addressing the problems that led to removal. Once reunification services have been terminated, "'[t]he burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue.'" (*In re Vincent M.* (2008) 161 Cal.App.4th 943, 955.)

As the judge reasonably determined, "there's no change in circumstances and that according to today's report, [mother] admits to using as recently as this summer and there's no evidence of sobriety or completed treatment since the use that she admits in July of 2020 where she indicated her drug of choice was opiates and prescription pills, as well as occasional marijuana use. The issue came in with concerns regarding Mom's drug use and that issue is not resolved." Given mother's long-standing drug addiction, absence

17

of evidence of her sobriety, and lack of evidence to show real progress in addressing the issue of domestic violence, the judge did not abuse her discretion in deciding mother was not entitled to a hearing on her section 388 petition.

B. *Beneficial Relationship Exception*

Father argues the judge erred in terminating his parental rights because the child shared a substantial bond with him and termination of the bond would greatly harm the child.

"'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are denied or terminated, "'the focus shifts to the needs of the child for permanency and stability.'" (*Ibid.*) Adoption is preferred once reunification services have been terminated, and "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing" evidence it is likely the child will be adopted. However, "when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental

rights in certain circumstances defined by statute. One of these is the parental-benefit exception." (*In re Caden C.* (May 27, 2021, S255839) slip opn. [at p. 9].)

Our Supreme Court recently addressed what that exception requires in *In re Caden C.*, namely that the parent show they have "regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*In re Caden C.*, *supra*, [at p. 9].)

The Court indicated we should continue to be guided in our understanding of these elements by the influential appellate court opinion *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*), which emphasized that in "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (See *Autumn H.*, at p. 575.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. (*Ibid.*) That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a]

19

significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*In re Caden C.*, *supra*, at [p. 15].)

In re Caden C. makes clear that is the end of the analysis. Some appellate courts have held a parent must provide some additional compelling reason to apply the exception. That's no longer permitted. A compelling reason for applying the exception exists whenever the relationship with the parent is so important that it outweighs the benefits of adoption. (*In re Caden C.*, *supra*, [at pp. 18-19].) "What this means is that the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*In re Caden C.*, *supra*, [at p. 20].)

The Court also drew a line against finding a parent's failure to address the root causes of the dependency *means* the exception shouldn't apply. (*In re Caden C.*, *supra*,

[at p. 21] ["A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception"].) "The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Id.* [at p. 23].) Continuation of the problems that led to dependency may be relevant to show continuing the relationship may have a negative effect on the child, but they cannot be treated as dispositive. (*Id.* [at pp. 22-23].) "[T]he parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* [at p. 23].)

The *In re Caden C.* court also resolved a conflict over the standard of review in such cases. The "substantial evidence standard of review applies to . . . [t]he determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders . . . [and the] factual determination whether the relationship is such that the child would benefit from continuing it.'" (*In re Caden C.*, *supra*, [at p. 25].)

The determination whether termination of parental rights would be detrimental to the child is different. "As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come

21

from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*In re Caden C.*, *supra*, [at p. 26].) However, when "[t]he court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home . . . 'the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion.'" (*Id.* [at pp. 26-27].)

It's undisputed here that father maintained consistent and regular contact with his son, and the judge so found. The only questions we face are whether the father and son had a relationship that was beneficial to the child and whether the harm of severing that relationship outweighs the benefit of stability in adoption.

The judge found father and son did not have a beneficial relationship on the ground that father didn't occupy a "parental role." Father objects that it's not necessary for a parent to occupy a parental role or have day-to-day responsibilities for a child's care in order for a strong and beneficial parent-child relationship to exist such that termination of parental rights would be detrimental to the child. We agree.

22

As the Court of Appeal held in *In re S.B.* (2008) 164 Cal.App.4th 289, precedent "does not narrowly define or specifically identify the type of relationship necessary to establish the exception. The exception may apply if the child has a 'substantial, positive emotional attachment' to the parent. [Citation.] We do not believe it is reasonable to require the parent of a child removed from parental custody to prove the child has a 'primary attachment' to the parent, or to show the parent and the child have maintained day-to-day contact. If that were the standard, the rule would swallow the exception." (*Id.* at p. 299; see also *In re Caden C.*, *supra*, [at p. 20] ["[T]he parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"].) Taking the categorical approach the judge did in this case inappropriately limits the kinds of relationship that it may be detrimental to sever.

Our conclusion doesn't end the analysis however, because the judge didn't abuse her discretion by determining severing the relationship would not outweigh the substantial benefit of adoption. In this case, it is undisputed father maintained emotionally positive and consistent supervised contact with R.M. The question is whether he demonstrated they shared such a substantial, positive emotional attachment that freeing the child for adoption would pose a great detriment to him which outweighs the benefits of adoption. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Father argues he carried this burden because the record showed R.M. enjoyed their visits and was bonded to him. We acknowledge father consistently attended his visits with R.M., and the child

had positive reactions to his presence. Unfortunately for father, this evidence falls short of establishing their relationship was so positive and substantial it outweighed the benefits of living in a permanent home with his prospective adoptive parents.

The child also exhibited a strong relationship with his prospective adoptive parents. The social worker reported he appeared happy and well-cared for. He had bonded with his caregiver and looked to her for comfort, assurance, and protection. He was meeting his developmental milestones and exhibited excellent verbal and communication skills. He had adjusted well to the placement and viewed his caregivers as parental figures referring to them as "mom" and "dad." The social worker reported the child and his caregivers shared a loving bond and displayed a healthy relationship. The caregivers showed commitment to the child's long-term care and expressed a strong desire to adopt him. Moreover, he was placed there together with his siblings. Finally, the child had started to say things like "I don't want to come here," referring to the visits, and "I want to go home with my Mom," referring to his caregiver.

All of this is strong evidence that the child had already transitioned to viewing his prospective adoptive parents as his parents and that he would not suffer harm from severing the relationship with father. At minimum, we conclude the judge acted reasonably in determining that the prospective harm did not outweigh the important benefits of adoption, and therefore she did not abuse her discretion by declining to apply the beneficial relationship exception in this case.

### III

### DISPOSITION

We affirm the orders of the juvenile court terminating the rights of both parents.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                                                    SLOUGH                    
                                                                                          J.


We concur:


MILLER                    
            Acting P. J.


FIELDS                    
                    J.